# In the United States Court of Federal Claims

No. 20-489 C

Filed: February 16, 2023

_____

)
JAHLEEL ASSAD, )
 )
                    *Plaintiff*, )
 )
  v. )
 )
THE UNITED STATES, )
 )
                    *Defendant.* )
_____ )

*Kenneth E. Barton, III*, Cooper, Barton & Cooper, LLP, Macon, GA, for Plaintiff.

*Matthew J. Carhart*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Andrew H. Woodbury*, Litigation Attorney, United States Air Force, of counsel, for Defendant.

## OPINION AND ORDER

**MEYERS, Judge**.

      Jahleel Assad contends that the Air Force breached a settlement agreement they entered regarding his separation from civilian service. Specifically, he believes that the Air Force violated terms of the settlement agreement by giving a negative reference and failing to remove negative documentation from his personnel file. The government moves for summary judgment on the ground that it performed each obligation under the settlement agreement. The Court agrees. The record is clear that it was a separate employer, which plaintiff admits was not affiliated with the United States, that gave the negative reference to one of Assad's potential employers. And the settlement agreement states explicitly what the Air Force would do to update Assad's personnel file and that Assad waived any claim that it should do more than that explicitly stated in the agreement. Therefore, the Air Force did not breach the settlement agreement by not doing what the Air Force explicitly said it would not do—adjust Assad's personnel records in any way other than those expressly called for in the agreement. Therefore, the Court grants the government's motion for summary judgment.

### I.    Background

      Jahleel Assad was a federal civilian employee working as an Electronics Engineer from October 21, 2013, to December 24, 2016 at Robins Air Force Base, Georgia, and from December

25, 2016 to November 5, 2018 at Naval Air Station ("NAS") Pensacola, Florida.  ECF No. 20-1 at A9.  On March 14, 2018,[1] Assad filed an Equal Employment Opportunity Commission ("EEOC") complaint against the Air Force alleging employment discrimination.  ECF No. 21-1 at 26;[2] *see* ECF No. 4 ¶ 5.  Later that month, Assad's supervisor, Ms. Katrina Ockman, issued a Notice of Proposed Suspension to Assad citing "Conduct Unbecoming of a Federal Employee" and documented her related interactions in a Memorandum for Record.  ECF No. 21-1 at 11-15.  On May 4, 2018, the Air Force opened a Security Information File ("SIF") suspending Assad's access to classified information and restricted areas.  ECF No. 21-1 at 16-17; *see also* ECF No. 20-1 at A110 ("SIFs serve as a repository [for] documentation of unfavorable or derogatory information that requires further review, evaluation, or investigation to resolve outstanding administrative or adjudicative concerns.").  The SIF echoed concerns raised by Ockman in Assad's Notice of Proposed Suspension, including his time and attendance violations, falsifying official documents, and failing to follow security procedures.  ECF No. 21-1 at 16.  The SIF also provided that, "[w]hen Mr. Assad is counseled, he becomes defensive and abusive towards his supervisor.  This conduct is unacceptable behavior.  All supporting documentation will be forwarded to the Central Adjudication Facility (CAF) for final determination."  ECF No. 21-1 at 16.  On May 10, 2018, Assad was "placed in a non-duty pay status . . . while the agency conduct[ed] an inquiry into [his] inappropriate conduct . . . ."  ECF 21-1 at 21.  This inquiry resulted in the issuance of two Notification of Personnel Action Forms (each, an "SF-50") suspending Assad's employment for specified periods of time: the first issued on May 23, 2018, for conduct unbecoming of a federal employee, and the second issued on August 6, 2018, for insubordination, defiance of authority, inappropriate conduct, and failure to follow leave procedures.[3]  ECF No. 21-1 at 22-25.

On November 5, 2018, Assad entered into a Negotiated Settlement Agreement (the "Settlement Agreement" or the "Agreement") with the Air Force "to settle all existing matters relating to [Assad's] employment . . . ."  ECF No. 4-1 ¶ 1.  The Settlement Agreement constituted a "full and final settlement" and "a complete accord and satisfaction of any and all claims, including any and all equitable and legal relief."  ECF No. 4-1 ¶ 1.  The Settlement Agreement also contains a clause explaining that it "constitutes the full and complete understanding" between Assad and the Air Force, and "that no other promises or agreements, which may have been stated or discussed during the period of time preceding the signing of the Agreement" would bind the Air Force "unless clearly stated in the Agreement."  ECF 4-1 ¶ 8.

---

[1] Assad filed an informal EEOC complaint on March 14, 2018.  *See* ECF No. 21-1 at 26.  He then filed a formal EEOC complaint on June 26, 2018, after the EEOC Specialist assigned to review his informal complaint closed the matter.  *Id.*

[2] Because Assad's attachment to his response is not consecutively numbered, the Court cites to the ECF header when citing ECF No. 21-1.

[3] The Air Force issued an additional Notice of Proposed 14 Calendar Day Suspension to Assad in September 2018.  It is unclear from the record whether this Notice replaced the SF-50 dated August 6, 2018, or if Assad received Notice of a third suspension in September 2018.  In either case, the Air Force acknowledged an administrative error in the Notice, which should have listed "Absent Without Leave" and "Use of Abusive or Offensive Language" as the causes for his suspension.  ECF No. 21-1 at 42.

Additionally, the Settlement Agreement provides that Assad agreed that "by entering into the Agreement, [he] has been afforded an opportunity to carefully read the Agreement. [He] understands and agrees to all of the provisions of the Agreement and understands and agrees that he has been given the opportunity to consult legal counsel regarding the Agreement prior to signing the Agreement. [Assad] further agrees that he has voluntarily signed the Agreement." ECF No. 4-1 ¶ 9.

The Settlement Agreement imposed three principal obligations on the Air Force, which were:

> a. To pay a one-time lump sum payment in the amount of eighteen thousand two hundred eighty-two ($18,282.00) dollars. This one-time lump sum payment of $18,282.00 covers attorney's fees in the amount of nine thousand ($9,000.00) dollars and Complainant's back pay in the amount of nine thousand two hundred eighty two [sic] ($9,282.00) dollars.
>
> * * * * *
>
> c. To, within fourteen (14) business days, process an SF-50 and SF-52 through the Defense Civilian Personnel Data System reflecting Complainant's voluntary resignation, effective as of the date of the Complainant's signature on this Agreement. [and]
>
> d. To provide Complainant with a neutral reference attached hereto and made a part of the Agreement hereof.

ECF No. 4-1 ¶ 2(a)-(d), ECF No. 4-1 at 8.[4]  The Neutral Reference Letter confirmed Assad's dates of employment, established his duty assignment as an Electronics Engineer (NH-0855-III), and, in relevant part, provided that "Assad resigned for personal reasons" on November 5, 2018. ECF No. 4-1 at 8. The Air Force provided the neutral reference. *Id*.

As consideration for these obligations, Assad agreed to: (1) resign from federal employment with the Air Force; (2) dismiss his EEOC complaint with prejudice; (3) refrain from reapplying for employment with the Air Force for a period of five years; (4) waive any claims against the Air Force related to his employment and EEOC complaint, except to enforce the terms of the Settlement Agreement; and, (5) unless "expressly provided for in Paragraph 2[,] . . . waive[] any and all rights to seek adjustments to personnel records maintained by the [Air Force]." ECF No. 4-1 ¶ 3(a)-(d), (h). Assad "agree[d] that the terms and conditions of the Agreement constitute[d] a full and complete settlement of any and all pending differences, disputes, [] grievances, claims or charges which have been, could have been, or could be brought" against the Air Force. ECF No. 4-1 ¶ 4(a)-(b).

---

[4] Because Assad's attachment to his amended complaint is not consecutively numbered, the Court cites to the ECF header when citing ECF No. 4-1.

After separating from the Air Force, Assad submitted applications for employment with two government contractors, IndraSoft, Inc. ("IndraSoft") and Fluor Marine Propulsion, LLC ("Fluor"). ECF No. 21 at 6, 9. On February 27, 2019, IndraSoft extended an employment offer to Assad, which was contingent on his ability to obtain and maintain clearance to access certain secure areas at Robins Air Force Base with a Common Access Card ("CAC"). ECF No. 4 ¶ 17. However, on March 11, 2019, IndraSoft informed Assad that his application for such clearance had been denied, and his offer for employment was thereby rescinded. ECF No. 20-1 at A57. During his deposition, Assad testified that an IndraSoft security officer told him IndraSoft was not able to get "hold of [his] records, . . . they are being flagged[,] . . . . [and] that someone filed a complaint, but the person or entity did not give the reasons . . . ." ECF No. 20-1 at A17 (Assad Dep. 19:10-15). Assad further testified that he attempted to contact the Department of Defense ("DoD") CAF to resolve his clearance issues, but was informed that they "only talk to the employers not the employees." ECF No. 20-1 at A18 (Assad Dep. 23:9-10).

Assad also received a conditional offer for employment from Fluor, which was similarly contingent on his ability to obtain "[s]atisfactory results from a pre-employment investigation" and security clearance from the Department of Energy ("DoE"). ECF No. 21-1 at 89. Fluor engaged Employment Background Investigations, Inc. ("EBI") to complete the pre-employment screening, which included verification of Assad's employment history. ECF No. 21 at 9. EBI successfully verified Assad's employment at Robins Air Force Base with Mr. Daryl Aikens, his supervisor, who confirmed that Assad "transferred to another agency" and would be eligible for rehire "upon review." ECF 20-1 at A80. EBI further verified Assad's employment with Albany Technical College, which yielded "hits" in his supervisor references. ECF No. 20-1 at A67.

During his background check, Assad learned that EBI's investigation found that an unnamed former supervisor or supervisors stated that they would not rehire him and that he had been terminated. ECF No. 21-1 at 99; *see also* ECF No. 20-1 at A67. EBI's report provides additional clarity into the background investigation's findings. The only contacts that EBI documented saying that Assad was terminated and not eligible for rehiring were at Albany Technical College. ECF No. 24-1 at SA82-83.

Finally, although EBI was initially unable to verify Assad's employment with NAS Pensacola after contacting Ockman, Fluor later confirmed Assad's employment through Amundson, who told Fluor that Assad "is a former employee with the US Air Force and is eligible for rehire." ECF No. 20-1 at A88; *see also* ECF No. 21-1 at 91 (Amundson informing Ockman he would "see what the settlement agreement stated and [] respond back to the requesting party as [he] had received the same inquiry."). Based on EBI's report, Fluor's Sub-Division Manager for the Talent Acquisition Team concluded that "no disqualifying employment issues exist[ed]" for Assad, and therefore initiated the security clearance process with the DoE. ECF No. 20-1 at A60-61; ECF No. 20 at 6. Assad subsequently obtained security clearance to begin employment with the Naval Surface Warfare Center, and remained actively employed there as of his deposition. ECF No. 20-1 at A20 (Assad Dep. 30:7-20) ("[A]ll my clearance is [] good now.").

Assad filed suit in this Court on April 22, 2020, alleging the Air Force breached its duties under the Settlement Agreement to provide a neutral reference and "to show that [his] resignation [from the Air Force] was voluntary." ECF No. 4 ¶ 55-65. Assad further alleges that

4

"[a]s a result of the Air Force's breach of contract, [he] was denied employment of which he was otherwise qualified." ECF No. 4 ¶ 66. The Government moves for summary judgment.

## II.     Jurisdiction and Legal Standard

### A.     Jurisdiction

The Tucker Act, 28 U.S.C. § 1491(a)(1), confers this Court's jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." The Federal Circuit has "long held that disputes over Settlement Agreements are governed by contract principles" and that a Settlement Agreement is a contract. *Cunningham v. United States*, 748 F.3d 1172, 1176 (Fed. Cir. 2014). Accordingly, this Court has jurisdiction to review an alleged breach of a Settlement Agreement between a private citizen and the Government, "the proper interpretation of which is a matter of law." *Ramona Two Shields v. United States*, 820 F.3d 1324, 1329 (Fed. Cir. 2016) (citation omitted).

### B.     Legal Standard

Rule 56 of the United States Court of Federal Claims "is patterned on Rule 56 of the Federal Rules of Civil Procedure . . . and is similar both in language and effect." *Gutz v. United States*, 45 Fed. Cl. 291, 295 (1999). Both rules provide that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine" dispute of material fact exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" as opposed to "disputes that are irrelevant or unnecessary[.]" *Id.* Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). Moreover, absent supporting evidence, "mere allegations of a genuine issue of material fact . . . will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1374 (Fed. Cir. 2009); *see also Anderson*, 477 U.S. at 247-48.

In considering a motion for summary judgment, the Court must "tak[e] care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citation omitted). "The moving party bears the [initial] burden of demonstrating the absence of genuine issues of material fact." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). However, the moving party "may discharge [such initial] burden by showing the [C]ourt that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial

necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323); *see also* RCFC 56(c).

### III. Discussion

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). It is well settled that a "party breaches a contract when it is in material non-compliance with the terms of the contract." *Gilbert v. Dep't of Justice*, 334 F.3d 1065, 1071 (Fed. Cir. 2003) (citation omitted). Such "material non-compliance" constitutes breach when it relates to "a matter of vital importance and goes to the essence of the contract." *Williams v. United States*, 144 Fed. Cl. 218, 231 (2019) (quoting *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)).

It is undisputed that the Settlement Agreement is a valid contract. *See* ECF No. 20 at 8; ECF No. 21 at 12-13. The parties also do not dispute that the Air Force fulfilled its obligations under the Settlement Agreement to issue the lump sum payment and process the SF-50 and SF-52, each indicating that Assad resigned for "Personal Reasons." ECF No. 20-1 at A51-53; ECF No. 21-1 at 47-52; *see also* ECF No. 20-1 at A22-A23 (Assad Dep. 39:11-13, 43:15-18) (Assad acknowledging the Air Force's compliance with its payment and SF-50/SF-52 obligations). And the Air Force provided the neutral reference in the form the Settlement Agreement required. ECF No. 4-1 at 8. Assad, however, alleges that the Government breached "both its implied and express obligations" under the Settlement Agreement: (1) to remove all adverse information from his personnel file, including prompt closure of his SIF; (2) to refrain from sharing adverse information in the SIF Closure Memorandum ("the SIF Memo"); and (3) to provide neutral references to IndraSoft and Fluor, without disclosing his ineligibility for rehire and allegations of his misconduct. ECF No. 21 at 12, 15-16.

Based on the record before the court, Assad has not created a genuine dispute of material fact supporting his allegations that the Air Force breached its duties under the Settlement Agreement. The Government is therefore entitled to summary judgment as a matter of law.

### A. The Air Force satisfied its duties under the Settlement Agreement when it provided a neutral reference to IndraSoft.

#### 1. The Air Force did not have a duty to amend Assad's personnel records, including with respect to his SIF, except as expressly set forth in Paragraph 2 of the Settlement Agreement.

Assad complains the Government breached the Settlement Agreement when it "failed to remove adverse information concerning [his] purported misconduct from his personnel file and failed to close a security-related investigation that had been [the] subject of the dispute leading to the Agreement," which caused IndraSoft to rescind its offer of employment. ECF No. 21 at 12. Specifically, he testified IndraSoft was not able to get "hold of [his] records, . . . they [were] being flagged[,] . . . . [and] that someone filed a complaint, but the person or entity did not give the reasons . . . ." ECF No. 20-1 at A17 (Assad Dep. 19:10-15). According to Assad, the

Settlement Agreement created a duty for the Air Force "to take affirmative steps to reflect that [he] had voluntarily resigned from his position with the Air Force[,]" not only to provide him with a neutral reference and amend his SF-50 and SF-52. ECF No. 4 at ¶ 56. And the "SF-50 and SF-52 are only a small part of [his] Official Personnel File ([]"OPF"). . . . Accordingly, when an agency agrees to issue a new SF-50 reflecting that an employee resigned for personal reasons, the agency breaches the implied terms of the settlement agreement when it refuses to remove references suggesting otherwise in the employee's OPF." ECF No. 21 at 14-15 (citations omitted).

In support, Assad cites to a string of cases, including *Conant v. Office of Personnel Management*, 255 F.3d 1371, 1376-77 (Fed. Cir. 2001), where the Court found the agency's external disclosure of an original SF-50—rather than the modified SF-50, reflecting resignation for "personal reasons"—to materially breach the Settlement Agreement. There, the Federal Circuit determined that such breach rose from the agency "submitting documents it had agreed to rescind[,]" which "was not immaterial . . . ." *Id.* at 1377. Further, Assad argues that the "Merit Systems Protection Board has not only recognized the *Conant* rule, but it has also found that an agency merely issuing a new SF-50, without making further changes to a personnel file, may be in material breach of implied terms of a settlement agreement." ECF No. 21 at 16. Therefore, Assad maintains that the Settlement Agreement not only imposed "an obligation to issue a new SF-50 reflecting [] voluntary resignation," but also to "remove[] any information in [his] OPF that was inconsistent with that explanation[,]" including with respect to his SIF. ECF No. 21 at 16.

In considering a motion for summary judgment, the Court must interpret a Settlement Agreement's "provisions to ascertain whether the facts [] allege[d] would, if true, establish a breach of contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014); *see also Coast Fed. Bank, F.S.B. v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (Contract interpretation "begins with the language of the written agreement."). If the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993); *see also TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (plain and ordinary meaning can be "derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances") (quotation omitted). Indeed, the Court must construe terms "in a manner that gives meaning to all of [the contract's] provisions and makes sense." *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)). If the contract provisions are clear, "the [C]ourt may not resort to extrinsic evidence to interpret them." *Id.*; *see also City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where the language is clear.").

The Settlement Agreement's plain terms include an integration clause that establishes that it "constitutes the full and complete understanding between [Assad] and the Agency." ECF No. 4-1 ¶ 8. The Air Force's obligation to update its records are unambiguously set forth in Paragraph 2 and are limited to "process[ing] an SF-50 and SF-52 through the Defense Civilian Personnel Data System reflecting Complainant's voluntary resignation, effective as of the date of the Complainant's signature on this Agreement." ECF No. 4-1 ¶ 2(c). The Settlement Agreement also makes clear that this would be all the Government would do, providing that

"except as *expressly* provided for in Paragraph 2 . . . [Assad] waive[d] any and all rights to seek adjustments to personnel records maintained by the Agency." ECF No. 4-1 ¶ 3(h) (emphasis added). Assad's assumption that other records would also be expunged does not impose an affirmative duty on the Air Force to amend his records. There is no implied duty that can overcome an express provision of a written contract. *E.g., Hawkins v. United States*, 96 U.S. 689, 697 (1877) ("Express stipulations cannot in general be set aside or varied by implied promises . . . ."); *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) (An "implied duty . . . cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.").

On this point, Assad's reliance on *Conant* is misplaced. In *Conant*, the Federal Circuit found the Government had an implied obligation to produce the revised SF-50, rather than a prior SF-50, when it agreed to modify such records. *Conant*, 255 F.3d at 1376. The Court did not imply a general duty to overhaul the employee's entire personnel record. *See id.* Thus, the problem in *Conant* was that the Government agreed to revise the SF-50, which it did, but when submitting her information for a disability retirement the Government provided the original SF-50. *Id.* Here, Assad provides no evidence that his prior SF-50 was ever provided to a prospective employer, and he waived his right to seek further adjustments to his records in signing the Settlement Agreement as negotiated. Thus, there is no breach of the obligation to provide the correct (i.e., revised) SF-50.

Similarly without merit is Assad's argument that, unless the Government was required to remove all adverse information from his OPF, "the provision of the Agreement requiring [issuance of] a new SF-50 reflecting a voluntary resignation would have been of no value . . . ." ECF No. 21 at 20. To be sure, "[t]he parties agree[d] and underst[oo]d that no other promises or agreements, which may have been stated or discussed during the period of time preceding the signing for the Agreement, will be binding on the Agency unless clearly stated in the Agreement." ECF No. 4-1 ¶ 8. If Assad intended to impose a duty on the Air Force to amend his entire OPF, he (through his counsel) should have negotiated for that in the Settlement Agreement. While Assad cites to cases relying on other agreements that describe expansive representations about the treatment of personnel records in his briefings, the Settlement Agreement contains no such representations. For example, *Conant* also found a breach because the Government failed to use its best efforts to help Ms. Conant obtain a disability retirement. *Id.* This is no help to Assad, however, because the agreement in *Conant* expressly obligated the Government (the IRS) "to use its 'best efforts' to 'effectuate' Ms. Conant's disability retirement . . . ." *Id.* In other words, this was not an implied duty but an express one spelled out in the contract. In the end, the Court must enforce the Settlement Agreement as written and there is no evidence that the Government breached that agreement.

To the extent Assad—who was represented by counsel when negotiating and signing the Agreement—further argues that the Court should deny summary judgment because he "never read it" and "it was all kind of rushed[,]" he is mistaken. ECF No. 20-1 at A24 (Assad Dep. 48:15-17). Assad testified that "I did not read the entire document. . . . To be honest, no, I did not read it carefully . . . ." ECF No. 20-1 at A21 (Assad Dep. 34:20-21, 36:15-16). In bold and capitalized text located immediately above the signature block where Assad signed, the Settlement Agreement provides that "the parties acknowledge that they have read the agreement carefully, that they understand it, and that they are voluntarily entering into the agreement." ECF

No. 4-1 ¶ 12.  If a party fails to read and adequately negotiate an agreement, particularly when represented by counsel, that party cannot later complain that he had not read the agreement.

Accordingly, the Settlement Agreement does not impose any duty on the Air Force—express or implied—to revise Assad's personnel records other issuing the revised SF-50 and SF-52 as set forth in Paragraph 2 of the Agreement.  There is no dispute the Air Force did so here.  ECF No. 20-1 at A23 (Assad Dep. 43:15-18) (Assad acknowledging that the Air Force processed a revised SF-50 and SF-52 reflecting his voluntary resignation).

> 2. <u>The Air Force did not breach the Settlement Agreement when it issued the SIF Memo.</u>

Assad argues that the Government's failure to close his SIF prompted the denial of his CAC application and was "the reason that IndraSoft had revoked . . . or withdrawn the [employment] offer . . . about two weeks earlier."  ECF No. 29 at 31:7-11; *see* ECF No. 21 at 18.  After signing the Settlement Agreement, the Air Force initiated closure of Assad's SIF and directed Assad to contact the DoD CAF should adjudication of his security clearance resume on behalf of a future employer.  ECF No. 21-1 at 104.  On March 27, 2019, the Air Force issued the SIF Memo, indicating that the DoD "had lost jurisdiction to make a favorable or unfavorable eligibility determination" as to Assad's SIF, thereby closing it, "since . . . Assad was no longer affiliated with the agency."  ECF No. 20-1 at A111.  Such "loss of jurisdiction results when an individual retires, separates, or ends their affiliation with DoD before an adjudications facility can make an eligibility determination.  Under these circumstances the adjudication facility will cease all work on the individual's adjudicative record."  ECF No. 20-1 at A102 (Department of the Air Force, Air Force Manual 16-1405 (Aug. 1, 2018) (implementing Department of Defense Manual 5200.02, Procedures For The DoD Personnel Security Program, § 9.3(a) (Aug. 1, 2018))).  The Air Force must also "notify the DoD CAF if the individual separates or is no longer employed by the AF."  *Id.*  Accordingly, the SIF Memo directed the Air Force to notify the DoD CAF of Assad's separation, which prompted closure of his SIF due to loss of jurisdiction.  *See* ECF No. 4-2 ¶ 5.

"The DoD CAF is the sole authority to determine security clearance eligibility of non-intelligence agencies . . . [and is] an independent organization [that] cannot be influenced by the Air Force to make an adjudicative decision."  ECF No. 21-1 at 104.  If a CAC application is denied, the owning organization (i.e., the current or prospective employer) must contact the DoD CAF directly to resolve such denial.  ECF No. 29 at 12:5-10.  Indeed, it is "the owning organization [that] will communicate with the DoD CAF to determine whether eligibility can be established based on the existing background investigation or . . . a new background investigation[,]" rather than the employee himself.  ECF No. 20-1 at A102 (Department of the Air Force, Air Force Manual 16-1405 (Aug. 1, 2018) (implementing Department of Defense Manual 5200.02, Procedures For The DoD Personnel Security Program, § 9.3(a)(1)(c) (Aug. 1, 2018))).  There is no evidence in the record that IndraSoft contacted the DoD CAF to resolve Assad's CAC denial.  Assad admitted that he does not know what IndraSoft did.  ECF 20-1 at A18 (Assad Dep. 23:18-20) ("Q: Do you know if Indrasoft ever contacted DOD CAF? A: No.  I don't know what they did.").  To be sure, if an owning organization does not challenge a denial, the decision will stand, and the DoD CAF will not further adjudicate the issue on its own accord.  The Air Force lost jurisdiction as Assad's owning organization upon his separation, and it is not

obligated to intervene, or otherwise assist with adjudication of security clearance for prospective employers.  Therefore, the Air Force did not breach the Settlement Agreement when it issued the SIF Memo, or when DoD CAF denied Assad's CAC application, causing IndraSoft to revoke its offer.

The parties do not dispute that the SIF Memo contained inaccurate information about Assad's separation.  *See* ECF No. 20 at 9.  In particular, the SIF Memo "inaccurately stated that . . . Assad had been 'terminated on 20 April 2018 due to . . . inability to follow established security procedures, personal conduct, and falsifying an official document.'" ECF No. 20 at 4 (citing ECF No. 20-1 at A55).  It also provided that Assad "will not return to duty[,]" that "Commanders recommendation was to remove [him] from civilian employment[,]" and that "Assad [had] been placed on administrative leave[,] and all access to classified information [had] been removed." ECF No. 4-2.  However, Assad does not offer any evidence that the SIF Memo, or any information with respect to his SIF, was provided to prospective employers or third-party agencies.  *See* ECF No. 20-1 at A31 (Assad Dep. 74:16-19, 75:10-16) (Assad acknowledging that he does not know whether the SIF Memo was provided to any prospective employer).  Nor could he show the SIF Memo caused or even influenced IndraSoft's decision to revoke its employment offer because IndraSoft revoked its offer *before* the SIF Memo was written.  *Compare* ECF No. 20-1 at A57 (Indrasoft revocation letter dated 3/11/2019) *with* ECF No. 4-2 (SIF Memo dated 3/27/2019).  Absent evidence that the Air Force provided IndraSoft—or any prospective employer—with adverse information, Assad fails to establish "damages caused by the [alleged] breach."[5] G*rand Acadian, Inc. v. United States*, 87 Fed. Cl. 193, 197 (2009) (quotation omitted).  Although Assad alleges and argues that Air Force personnel provided false information to prospective employers, he does not offer proof if it.  *See, e.g.*, ECF No. 21 at 11 ("[T]he problems . . . Assad encountered due to security clearance and CAC card issues as he tried to secure employment arose in March 2019, four months after the Agreement was executed and . . . Assad resigned, and because of information . . . Defendant's employees submitted that . . . they knew was not true.").  But "mere allegations of a genuine issue of material fact . . . will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B.*, 584 F.3d at 1374.

Assad further claims that, if he knew "the [Air Force] could tell people that he had been terminated, if he had any idea that his CAC card and security clearance issues would not have been resolved, then . . . it's pretty reasonable to say that neither [he] nor a reasonable person would have entered into the settlement agreement even with those express terms." ECF No. 29 at 48:3-10.  The Court disagrees.  First, there is no evidence in the record that the Air Force provided adverse information to IndraSoft, or any prospective employer, in breach of the Settlement Agreement.  To the contrary, as discussed in detail below, the evidence shows that it was a different former employer, which was unaffiliated with the Air Force, that gave negative information about Assad and that he was terminated.  Second, Assad had the opportunity to negotiate terms with respect to closing, or otherwise amending his SIF (or any other personnel files), before signing the Agreement.  He failed to do so.  And, despite whether Assad understood, or even read, the Agreement in its entirety, it is reasonable to expect that his counsel

---

[5] The record similarly does not indicate that Fluor received, or had any knowledge of, the SIF Memo or its contents.  To the extent Assad also intended to apply this argument to his employment application with Fluor, it is denied on identical grounds.

10

understood the terms—both those that he agreed to, and those he waived.  Absent express provisions addressing these security clearance and access issues, the Court agrees with the Government that it "shouldn't read into that absence a tacit commitment to do so in light of the background principles regarding the discretion reserved to the Executive on these sorts of determinations."  ECF No. 29 at 11:8-13.

In short, the Settlement Agreement is clear and unambiguous.  Thus, the Court must apply it by its terms as written.

### B. The Air Force satisfied its duties under the Settlement Agreement when it provided a neutral reference to Fluor.

Assad contends that "[i]n July 2019, Defendant [took] additional measures that caused [him] to lose an . . . offer of employment" with Fluor.  ECF No. 21 at 18.  Specifically, Assad alleges that the Government "told third parties, including other federal agencies, that [he] had been terminated from his position, and . . . that he was not eligible for rehire."  ECF No. 21 at 12.  In relevant part, Assad complains that "someone told [Fluor's EBI] investigator that [he] had been terminated and would not be considered for rehire, and despite [his] best efforts, there was nothing that he could say or documentation that he could provide that could explain . . . this erroneous information."  ECF No. 21 at 18-19.  Ultimately, "Assad did not hear back from Fluor, and he assumed that the contingent offer of employment had been withdrawn."  ECF No. 21 at 10.  He therefore asserts that "it was Defendant's actions and false statements that cause[d] [him] not to be able to begin this job[,]" ECF No. 21 at 19, and the Government failed to meet "its contractual obligation by providing [] the written, neutral reference[,] . . . in light of statements to third parties that . . . undermined the substance of said reference."  ECF No. 21 at 16.

As an initial matter, Assad offers no evidence that the Air Force provided Fluor, or EBI's investigators, with derogatory information about his employment.  Assad complains that an "Air Force Supervisor told the potential employer that the Air Force would not consider rehiring . . . Assad" and that "Assad did not resign from his position; rather, he had been terminated."  ECF No. 4 ¶¶ 28-29.  But the only communication between Fluor or EBI and the Air Force with respect to Assad's employment that is supported by evidence is Amundson's email stating Assad "is a former employee with the US Air Force and is eligible for rehire."  ECF No. 21-1 at 100.  This is not "derogatory information about his employment."  Assad also speculates that Ockman provided derogatory information to EBI or Fluor in breach of the Settlement Agreement, *see generally* ECF No. 29 at 33-34, but does not support this allegation with evidence in the record.  It is well-settled that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original).  The only basis for Assad's speculation is that "Fluor advised [him] that EBI had been unable to verify the supervisor references for his employment with Defendant, that one supervisor indicated he would not consider re-hiring [him], and that while [he] had indicated that he had resigned, EBI found that he had been terminated."  ECF No. 21 at 10 (citing ECF No. 21-1 at 99).  But the record clearly establishes that these statements did not come from the Air Force.

The record is clear.  Albany Technical College, not the Air Force, caused the "hits from employment supervisor references" in EBI's report by "indicat[ing] they would no[t] consider []

re-hire" for Assad, and confirming his separation "was a termination[.]" ECF No. 21-1 at 99; ECF No. 20-1 at A67. To the extent there was any doubt in the various communications between Fluor, EBI, and Assad as to who made the derogatory comments, EBI's report clearly states that the source for the derogatory comments was Albany Technical College. ECF No. 24-1 at SA 82. Assad does not contend that the Air Force is responsible for the college's statements. *See* ECF No. 29 at 38:17-18 ("[N]o, we are not alleging that the Air Force would be on the hook for what Albany Technical College reported."). Under any standard, the record demonstrates that the statements Assad speculates came from the Air Force did not and those third-party derogatory statements cannot support Assad's claim.

The only other feedback from the Air Force (other than Amundson's response above) came from Mr. Aikens, who worked with Assad at Robins Air Force Base. Mr. Aikens gave a "generally positive" reference, stating that Assad "transferred to another agency" and he would review an application from Assad for rehire if received. ECF No. 20-1 at A80. When asked in his deposition if Mr. Aikens' feedback was negative, Assad responded that "He's negative? No, it's not negative . . . ." ECF No. 20-1 at A34 (Assad Dep. 87:12-19) (acknowledging Aiken's feedback was not negative). If Mr. Aiken's feedback to EBI was not negative, it did not breach any provision of the Settlement Agreement.

Ultimately, Fluor determined that "no disqualifying employment issues exist[ed]"[6] for Assad after reviewing the results of his background verification and his application for security clearance remained pending as of July 2021. ECF No. 20-1 at A59-61. The record does not indicate that his offer has since been rescinded. *Id*. That Assad assumed Fluor's silence equated to withdrawal of his offer is immaterial and does not impact the Air Force's obligations under the Settlement Agreement. Accordingly, the Air Force did not breach its Settlement Agreement with Assad, Assad has failed to create a genuine dispute as to any material fact regarding such alleged breach, and the Government is entitled to judgment as a matter of law.

**IV.  Conclusion**

For the foregoing reasons, the Court grants the Government's motion for summary judgment. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge

---

[6] Assad claims that Mr. Drogo, the Sub-Division Manager for Talent Acquisition at Fluor, failed "to provide any evidence to support this contention, and therefore, it lacks the necessary foundation." ECF No. 21 at 11. However, Assad does not provide any evidence to contradict Drogo's affidavit, and the Court will not accept such an abstract assertion.